

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| CHARLOTTE SORINA-WASHINGTON | * | CIVIL ACTION |
|---|---|---|
| VERSUS | * | NO. 03-3643 |
| MOBILE MINI, INC. AND | * | SECTION J |
| XYZ INSURANCE COMPANY | * | MAGISTRATE 2 |

## PLAINTIFF'S OPPOSITION TO DEFENDANT MOBILE MINI, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT

Defendant Mobile Mini, Inc. (Mobile Mini) in its most recent Motion for Partial Summary Judgment and Motion for Summary Judgment attempts to have the Court give effect to the limitations of liability contained in the "Terms & Conditions" part of the document that forms the contractual agreement between it and Plaintiff Charlotte Sorina-Washington (Washington).

### I. LIMITATION OF LIABILITY

Mobile Mini's entire argument is vitiated by the fact that some, if not most, of the damage suffered by Washington arose out of the extra-contractual fault of Mobile Mini. As has been argued in Washington's opposition to Defendant Mobile Mini, Inc.'s first Motion for Summary Judgment, much, if not all, of the damages sustained were sustained as a result of the unlawful seizure that

Case 2:03-cv-03643-CJB   Document 38   Filed 01/11/05   Page 2 of 12

occurred due to the mistake of Mobile Mini in misapplying payments. This was shown in Washington's deposition wherein she stated:

> **Page 30**  24      Q. If you have any records showing those
> 25      payments, it's important for us to know when
> **Page 31**  1      you made payments, if you have cancelled
> 2      checks, those type of things because of your
> 3      claim that your unit was repossessed.
> 4           A. Well, I not only claimed it. They
> 5      told me that they accidentally applied my
> 6      payments to somebody else's account. And
> 7      Laurie read off the dates and the payments that
> 8      were made and I wrote them all down. It took
> 9      them a couple of days to research it, but they
> 10     found out they were applying it to somebody
> 11     else's account.
> 12          Q. Okay. And you also - -
> 13          A. They even stated to Mr. Scott, the
> 14     gentleman that came out to assess the damage to
> 15     my items, that they accidentally repossessed my
> 16     things.
> 17          Q. Okay. At some point, you called to
> 18     set up an automatic bank draft - -
> 19          A. Correct.
> 20          Q. - - of your account?
> 21          A. Correct. I wrote that down, also,
> 22     who I spoke to, that they did it on a 28-day
> 23     cycle, when it would start. I wrote down all
> 24     of that. And I have the check number that I
> 25     gave them to start the automatic draft.

**Exhibit A, Deposition of Charlotte Sorina-Washington Taken on August 13, 2004, pp.30-31.**[1]

The damage consisted both of breakage and mold and mildew. Washington's testimony in that area went as follows:

---

[1] Because Washington's deposition has already been entered into the record in full, Washington reproduces here only those pages of her deposition cited in this Opposition.

2

| | | |
|---|---|---|
| Page 25 | 21 | Q. I'd like to go through with you the |
| | 22 | different items and how they were damaged. |
| | 23 | The couch, chair, and ottoman - - |
| | 24 | let's do it this way before we go through all |
| | 25 | of it. Was the primary damage to all of these |
| Page 26 | 1 | items mold on the items? |
| | 2 | A. Mold, mildew, and water damage. |
| | 3 | Q. Were any of the items broken? |
| | 4 | A. Yes. |
| | 5 | Q. Do you know specifically which items |
| | 6 | those were? |
| | 7 | A. I purchased some crystal wine glasses |
| | 8 | when I went to Czechoslovakia and I had |
| | 9 | intended to put them in the home after it was |
| | 10 | renovated. And by them lifting the container, |
| | 11 | several of my items were thrown to the front of |
| | 12 | the container and lots of glass items were |
| | 13 | broken. |
| | 14 | Q. Primarily glass items, such as |
| | 15 | crystal? |
| | 16 | MR. WILLIAMS: |
| | 17 | Here are some pictures we brought |
| | 18 | that you have not seen that might help explain |
| | 19 | some of it (handing). |
| | 20 | MS. LAGARDE: |
| | 21 | If I can take a look at these, and |
| | 22 | then I'm actually going to send these to my |
| | 23 | copier and we will get them back to you. |
| | 24 | MR. WILLIAMS: |
| | 25 | Those are the only prints we have. |
| Page 27 | 1 | Charlotte retains the negatives, but those are |
| | 2 | the only prints. |
| | 3 | MS. LAGARDE: |
| | 4 | Okay, great. I will get these back |
| | 5 | to her. I just need to get color copies of |
| | 6 | them because - - |
| | 7 | MR. WILLIAMS: |
| | 8 | You should really return them to me. |
| | 9 | MS. LAGARDE: |
| | 10 | Okay. I'll return them to you, |
| | 11 | absolutely. |

```
          12          THE WITNESS:
          13              Mr. Scott took a lot more pictures
          14      than I did.
          15          MS. LAGARDE:
          16              Okay. I'm just going to glance
          17      through these quickly.
          18          THE WITNESS:
          19              And I believe my mom has some
          20      pictures, also, because she brought her camera
          21      up there.
          22          MS. LAGARDE:
          23              If your mom has any pictures, I'll
          24      request those.
          25          MR. WILLIAMS:
Page 28    1              Okay.
           2      EXAMINATION BY MS. LAGARDE:
           3          Q. At no point when I was just glancing
           4      through the pictures did I see a couch, chair,
           5      or ottoman.
           6          A. I believe that's on my mom's camera,
           7      but Mr. Scott did take pictures of it.
           8          Q. There were two mattress sets in the
           9      unit?
          10          A. Yes. They're leaning up against that
          11      tree in the picture.
          12          Q. You have a number of irreplaceable
          13      items down here: poster-size wedding picture,
          14      the Indonesian prayer doll, Princess doll,
          15      grandparents doll, photographs, etcetera. Do
          16      you recall if your china was broken or do you
          17      still have it?
          18          A. No.
          19          Q. Because certain of those - -
          20          A. I don't think that was in there.
          21          Q. Okay. The items that were in here,
          22      obviously the upholstered items, if they were
          23      moldy, would have to been thrown away; is that
          24      correct?
          25          A. Yes.
Page 29    1          Q. You threw all those away?
           2          A. Yes.
```

4

|  |  |
|---|---|
| 3  | Q. The electronics, were they kept and |
| 4  | cleaned or were they thrown away? |
| 5  | A. What? |
| 6  | Q. Two televisions. |
| 7  | A. No. They told me not to even try to |
| 8  | plug it in because it could probably cause a |
| 9  | short or something. |
| 10 | Q. Light fixtures, same story? |
| 11 | A. Those were the light fixtures that |
| 12 | the contractor was going to put in the house, |
| 13 | so they were never used, and they got - - one of |
| 14 | them was a big glass dome-type figure. It got |
| 15 | chipped on the end and I had to buy new |
| 16 | fixtures. |
| 17 | Q. Okay. |
| 18 | A. And the other items, Mr. Scott said |
| 19 | that that was toxic mold, so I shouldn't try |
| 20 | to, like, clean it or move it in the house. |
| 21 | Q. He advised you not to use bleach to |
| 22 | clean any of the china? He advised you to |
| 23 | throw everything away? |
| 24 | A. That's what he said, total out |
| 25 | everything. |

Ex. A, Washington depo., pp.25-29. *Emphasis supplied.*

## II. COMPLETE CONTRACT

Washington denied receiving the complete contract. Mobile Mini attempts to characterize Washington's answer only that "she could not remember." The dialogue went as follows:

| Page 30 | 1 | Q. Were you given copies of the |
|---|---|---|
|  | 2 | contracts that you signed? |
|  | 3 | A. I remember receiving that |
|  | 4 | (indicating). |
|  | 5 | Q. You remember receiving this |
|  | 6 | (indicating)? |
|  | 7 | A. Yes. |
|  | 8 | Q. Do you recall receiving a copy of the |
|  | 9 | Off-Site Storage Agreement that is referenced |

5

```
10      in this document, Exhibit D?
11           A. No.
```

**Ex. A, Washington depo., p.30.**

The testimony that Washington gave responded to the question the way it was asked. Washington, without contradicting herself, can and does say that she was *never* given the bulk of the agreement that was to have accompanied the face sheet and that she saw the contract for the first time at her deposition on August 13, 2004. **Exhibit B, Declaration of Charlotte Sorina-Washington.**

## III. CONCLUSION

Mobile Mini has offered little, if anything, new in this summary judgment. The damage to Washington's personal property was brought about by both active and passive negligence of Mobile Mini. The active negligence was extracontractual. For these reasons, this Honorable Court should deny Motion for Partial Summary Judgment and Motion for Summary Judgment and allow this matter to go to trial forthwith.

Respectfully submitted,

*[signature]*

DALE E. WILLIAMS, BAR #18709
Law Office of Dale Edward Williams
4508 Clearview Parkway, Suite 1-B
Metairie, Louisiana 70006-2379
Telephone: (504) 889-0700
Facsimile: (504) 887-3422

CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served upon opposing counsel by hand delivery or by placing a copy of same in the U.S. Mails, postage prepaid and properly addressed, on the 10th day of January, 2005.

*[signature]*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CHARLOTTE SORINA-WASHINGTON | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 03-3643 |
| | * | |
| MOBILE MINI, INC. AND | * | SECTION J |
| XYZ INSURANCE COMPANY | * | MAGISTRATE 2 |

* * * * * * * * * * * * * * * * * *

## PLAINTIFF'S STATEMENT OF CONTESTED MATERIAL FACTS

1. Some, if not most, of the damage suffered by Plaintiff Charlotte Sorina-Washington (Washington) arose out of the extra-contractual fault of Defendant Mobile Mini, Inc. (Mobile Mini). Much, if not all, of the damages sustained were sustained as a result of the unlawful seizure that occurred due to the mistake of Mobile Mini in misapplying payments.

2. The damage consisted both of breakage and mold and mildew.

3. Washington was never given the bulk of the agreement that was to have accompanied the face sheet and saw the contract for the first time at her deposition on August 13, 2004.

Respectfully submitted,

_/s/ Dale E. Williams_

DALE E. WILLIAMS, BAR #18709
Law Office of Dale Edward Williams
4508 Clearview Parkway, Suite 1-B
Metairie, Louisiana 70006-2379
Telephone: (504) 889-0700
Facsimile: (504) 887-3422

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing has been served upon opposing counsel by hand delivery or by placing a copy of same in the U.S. Mails, postage prepaid and properly addressed, on the 10th day of January, 2005.

_/s/ Dale E. Williams_

```
                                                                  1

  1              UNITED STATES DISTRICT COURT

  2              EASTERN DISTRICT OF LOUISIANA

  3

  4   CHARLOTTE SORINA-WASHINGTON
                                        CIVIL ACTION
  5   VERSUS                            NO. 03-3643
                                        SECTION "J"
  6   MOBILE MINI, INC., and            MAGISTRATE 2
      ZYX INSURANCE COMPANY
  7

  8   * * * * * * * * * * * * * * * * * * * * * * * *

  9
                  Deposition of CHARLOTTE
 10   SORINA-WASHINGTON, 35429 Reese Lane, Slidell,
      Louisiana, 70460, taken in the above-captioned
 11   cause, pursuant to the following stipulation,
      before Twalla R. Carroll, Certified Court
 12   Reporter, State of Louisiana, in the offices of
      JEANSONNE & REMONDET, 1700 One Canal Place, 365
 13   Canal Street, New Orleans, Louisiana, 70130, on
      Friday, the 13th day of August, 2004.
 14

 15
      APPEARANCES:
 16

 17
              LAW OFFICES OF DALE E. WILLIAMS
 18           (BY:  DALE E. WILLIAMS)
              Suite 1-B, 4508 Clearview Parkway
 19           Metairie, Louisiana  70006

 20              (Attorneys for the Plaintiff)

 21

 22

 23                                      EXHIBIT

 24                                         A

 25
```

EXHIBIT A

22

1  Q. It looks like it might be your
2  signature, but you don't recall signing a
3  credit application; is that right?
4  A. No. I did it via telephone.
5  Q. But you did go into Mobile Mini at
6  some point and sign the other documents?
7  A. No, I did not. The driver came out
8  to the yard.
9  Q. The driver came out to the yard and
10 you executed the documents while he was in the
11 yard with you?
12 A. Yes.
13 Q. When he dropped off the unit?
14 A. Yes. He wouldn't let me read any of
15 them. I specifically remember that.
16 Q. He wouldn't let you --
17 A. He said he was in a hurry, he had to
18 get back to the yard. This is basic stuff
19 saying he delivered the container and that the
20 container didn't have any dents or anything on
21 it. Because I attempted to read the documents,
22 and he was, like, "Well, ma'am, I'm in a hurry.
23 This is just basic documents. It's just saying
24 I delivered the container, it's not dented or
25 anything, and I just need you to sign here,

23

1  here, and here."
2  Q. And you agreed to sign the documents
3  without reading them?
4  A. He was rushing me.
5  Q. But you agreed to sign the documents?
6  A. I signed the documents.
7  Q. You sent a letter on July 21st, 2003,
8  to Crawford Company, Mr. Stephen Story. I'm
9  going to show you a copy of it.
10 MS. LAGARDE:
11    We can mark this as Exhibit C. I'm
12 going to put Page 2 of that in here. We'll fix
13 that up.
14 THE WITNESS:
15    (Reviewing document.) Yeah, I sent
16 this.
17 EXAMINATION BY MS. LAGARDE:
18 Q. That's the letter you sent?
19 A. Yes.
20 Q. Okay. On Page 2 of that letter, you
21 state that you have a -- you can furnish them a
22 copy of every conversation in reference to the
23 container and the incident. Do you have the
24 copies of those conversations with you today?
25 A. I didn't bring them. Yes, I do have

24

1  them. I didn't bring them with me.
2  Q. Are they voice-recorded copies?
3  A. No. They're actually handwritten
4  documents where I wrote down who I spoke to,
5  what time, what they said, what I said.
6  Q. Okay.
7  MS. LAGARDE:
8     I've issued discovery requests, and I
9  restate that I request any copies of that
10 correspondence that would memorialize any
11 conversations that Ms. Washington has had with
12 Mobile Mini.
13 MR. WILLIAMS:
14    Okay. We'll try to get those for you
15 as soon as we can.
16 MS. LAGARDE:
17    Okay.
18 EXAMINATION BY MS. LAGARDE:
19 Q. In Exhibit C, attached to the letter
20 that you sent, I'm going to go through it with
21 you, you gave an itemized list of items that
22 you believed to be in the storage unit. I'm
23 going to -- when did you make this list?
24 A. I made it upon request of the
25 insurance adjustor.

25

1  Q. Were you at the storage unit when you
2  made it or was this based on memory?
3  A. Oh, no. We took pictures and he took
4  pictures. He asked me to sit down and write up
5  everything that was in that container. So, as
6  we were pulling everything out, I was jotting
7  it down in a tablet. Then he asked me to sit
8  down and give as close an estimate to the cost
9  of those items as possible.
10 Q. Okay. Do you have any receipts to
11 support the prices that you listed?
12 A. Probably.
13 MS. LAGARDE:
14    I would request any receipts that may
15 support any of the amounts that you paid. It
16 doesn't matter to me if they're in francs or
17 lira or whatever you've paid for them. We can
18 convert those things if you -- I'd like any
19 receipts that support the prices.
20 EXAMINATION BY MS. LAGARDE:
21 Q. I'd like to go through with you the
22 different items and how they were damaged.
23    The couch, chair, and ottoman --
24 let's do it this way before we go through all
25 of it. Was the primary damage to all of these

26

1  items mold on the items?
2     A.  **Mold, mildew, and water damage.**
3     Q.  Were any of the items broken?
4     A.  **Yes.**
5     Q.  Do you know specifically which items
6  those were?
7     A.  **I purchased some crystal wine glasses**
8  **when I went to Czechoslovakia and I had**
9  **intended to put them in the home after it was**
10 **renovated.  And by them lifting the container,**
11 **several of my items were thrown to the front of**
12 **the container and lots of glass items were**
13 **broken.**
14    Q.  Primarily glass items, such as
15 crystal?
16    MR. WILLIAMS:
17       Here are some pictures we brought
18 that you have not seen that might help explain
19 some of it (handing).
20    MS. LAGARDE:
21       If I can take a look at these, and
22 then I'm actually going to send these to my
23 copier and we will get them back to you.
24    MR. WILLIAMS:
25       Those are the only prints we have.

27

1  Charlotte retains the negatives, but those are
2  the only prints.
3     MS. LAGARDE:
4        Okay, great.  I will get these back
5  to her.  I just need to get color copies of
6  them because --
7     MR. WILLIAMS:
8        You should really return them to me.
9     MS. LAGARDE:
10       Okay.  I'll return them to you,
11 absolutely.
12    THE WITNESS:
13       Mr. Scott took a lot more pictures
14 than I did.
15    MS. LAGARDE:
16       Okay.  I'm just going to glance
17 through these quickly.
18    THE WITNESS:
19       And I believe my mom has some
20 pictures, also, because she brought her camera
21 up there.
22    MS. LAGARDE:
23       If your mom has any pictures, I'll
24 request those.
25    MR. WILLIAMS:

28

1        Okay.
2  EXAMINATION BY MS. LAGARDE:
3     Q.  At no point when I was just glancing
4  through the pictures did I see a couch, chair,
5  or ottoman.
6     A.  **I believe that's on my mom's camera,**
7  **but Mr. Scott did take pictures of it.**
8     Q.  There were two mattress sets in the
9  unit?
10    A.  **Yes.  They're leaning up against that**
11 **tree in the picture.**
12    Q.  You have a number of irreplaceable
13 items down here:  poster-size wedding picture,
14 the Indonesian prayer doll, Princess doll,
15 grandparents doll, photographs, etcetera.  Do
16 you recall if your china was broken or do you
17 still have it?
18    A.  **No.**
19    Q.  Because certain of those --
20    A.  **I don't think that was in there.**
21    Q.  Okay.  The items that were in here,
22 obviously the upholstered items, if they were
23 moldy, would have to been thrown away; is that
24 correct?
25    A.  **Yes.**

29

1     Q.  You threw all those away?
2     A.  **Yes.**
3     Q.  The electronics, were they kept and
4  cleaned or were they thrown away?
5     A.  **What?**
6     Q.  Two televisions.
7     A.  **No.  They told me not to even try to**
8  **plug it in because it could probably cause a**
9  **short or something.**
10    Q.  Light fixtures, same story?
11    A.  **Those were the light fixtures that**
12 **the contractor was going to put in the house,**
13 **so they were never used, and they got -- one of**
14 **them was a big glass dome-type figure.  It got**
15 **chipped on the end and I had to buy new**
16 **fixtures.**
17    Q.  Okay.
18    A.  **And the other items, Mr. Scott said**
19 **that that was toxic mold, so I shouldn't try**
20 **to, like, clean it or move it in the house.**
21    Q.  He advised you not to use bleach to
22 clean any of the china?  He advised you to
23 throw everything away?
24    A.  **That's what he said, total out**
25 **everything.**

30

1 Q. Were you given copies of the
2 contracts that you signed?
3 A. I remember receiving that
4 (indicating).
5 Q. You remember receiving this
6 (indicating)?
7 A. Yes.
8 Q. Do you recall receiving a copy of the
9 Off-Site Storage Agreement that is referenced
10 in this document, Exhibit D?
11 A. No.
12 Q. The first payment that you made was
13 for $250; is that correct?
14 A. Correct.
15 Q. Did you make any payments after that
16 time?
17 A. Yes.
18 Q. Okay. And do you have bank
19 statements or records of making those payments?
20 A. I really haven't had a chance to
21 research it.
22 Q. Okay.
23 A. It's at home.
24 Q. If you have any records showing those
25 payments, it's important for us to know when

31

1 you made payments, if you have cancelled
2 checks, those type of things because of your
3 claim that your unit was repossessed.
4 A. Well, I not only claimed it. They
5 told me that they accidentally applied my
6 payments to somebody else's account. And
7 Laurie read off the dates and the payments that
8 were made and I wrote them all down. It took
9 them a couple of days to research it, but they
10 found out they were applying it to somebody
11 else's account.
12 Q. Okay. And you also --
13 A. They even stated to Mr. Scott, the
14 gentleman that came out to assess the damage to
15 my items, that they accidentally repossessed my
16 things.
17 Q. Okay. At some point, you called to
18 set up an automatic bank draft --
19 A. Correct.
20 Q. -- of your account?
21 A. Correct. I wrote that down, also,
22 who I spoke to, that they did it on a 28-day
23 cycle, when it would start. I wrote down all
24 of that. And I have the check number that I
25 gave them to start the automatic draft.

32

1 Q. During that time, you gave them a
2 phone number, a 985 phone number, that they
3 attempted to call which was disconnected.
4 A. Negative.
5 Q. You don't recall giving them a phone
6 number that may have been disconnected?
7 A. No. I gave them a phone number, but
8 I spoke with them several times, so I know it
9 wasn't disconnected.
10 Q. Do you recall what phone number you
11 gave them?
12 A. No, I don't.
13 Q. Did you ever have the phone
14 number (985) 781-2038?
15 A. Yes, I did.
16 Q. Is that number still in service?
17 A. That's my house number, not my cell
18 number.
19 Q. Is that number still in service?
20 A. No, it isn't. That was disconnected
21 before I even left to go on active duty because
22 they had to disconnect everything out of the
23 house.
24 Q. When would you think that number was
25 disconnected?

33

1 A. Probably sometime in December. I
2 think that's when they gutted out all the walls
3 and things like that.
4 Q. Okay.
5 A. When they started in October.
6 Q. Did you ever sign any authorization
7 for them to begin drafting payments out of your
8 bank account?
9 A. No. I did it via telephone.
10 Q. You didn't sign any document --
11 A. No, I did not.
12 Q. -- authorizing that?
13 A. I asked them how to set that up and
14 they connected me with a young man and he
15 explained it all to me. He asked for my bank
16 routing number. I told him I was on military
17 duty. He told me, "It's no problem. We can
18 take care of that for you. It'll start on this
19 date." He gave me -- quoted a date.
20 Q. Did you ever check your checking
21 account to make sure those payments were coming
22 out?
23 A. No, because I wasn't home to receive
24 my mail.
25 Q. Where was your husband during this

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CHARLOTTE SORINA-WASHINGTON | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 03-3643 |
| | * | |
| MOBILE MINI, INC. AND | * | SECTION J |
| XYZ INSURANCE COMPANY | * | MAGISTRATE 2 |
| * * * * * * * * * * * * * * * * * | * | |

### DECLARATION OF CHARLOTTE SORINA-WASHINGTON

Pursuant to the provisions of 28 U.S.C. § 1746, I, Charlotte Sorina-Washington, verify under penalty of perjury under the laws of the United States of America that I have personal knowledge of the following, and it is true and correct to my personal knowledge and belief.

1. I am the plaintiff in the above-captioned matter.

2. I was never given the bulk of the rental agreement that was to have accompanied the face sheet, and I indicated such in my deposition.

3. I saw the Off-Site Storage Agreement referenced in my deposition for the first time at my deposition, which was taken on August 13, 2004.

Slidell, Louisiana, this ____ day of January 2005.

_____
CHARLOTTE SORINA-WASHINGTON

EXHIBIT B